FILED

UNITED STATES DISTRICT COURT −4 AM 9: 12
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                          Case No. 2:21-cv-442-SPC-MRM

$440,068.08 in U.S. Currency and Nine
Vehicles,

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, United States of America, brings this complaint in accordance with

Supplemental Rule G(2), Supplemental Rules for Admiralty or Maritime Claims and

Asset Forfeiture Actions, and alleges, upon information and belief, as follows:

### NATURE OF THE ACTION

1.      This is a civil action *in rem* to forfeit to the United States of America,

pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(A), approximately

$440,068.08 in U.S. Currency and nine vehicles (hereafter, "Defendant Assets"), as

further described below:

    a.  Approximately $190,469.56 seized from Glenview Luxury Imports
        for the anticipated purchase of a 2021 Aston Martin Vantage, VIN
        SCFSSGAWXMGN05122;

    b.  Approximately $79,776.94 seized from First Florida Integrity Bank
        Account number 1129618 held in the name of Gerald M. Abraham
        MD;

    c.  Approximately $17,279.96 seized from Fifth Third Bank Account
        number 7435380691 held in the name of Gerald Michael Abraham
        MD PA;

    d.  Approximately $112,576.33 seized from American Momentum
        Bank Account number 201500602886 held in the name of Gerald
        Michael Abraham;

e.  Approximately $39,965.29 seized from Fifth Third Bank Account number 7435278051 held in the name of Gerald Michael Abraham MD PA;

f.  A 2020 Yellow Chevrolet Corvette, VIN 1G1Y82D4XL5109845;

g.  A 2020 Green Chevrolet Camaro, VIN 1G1FJ1R61L0109519;

h.  A 2020 White Aston Martin Vantage Coupe, VIN SCFSSGCWXLGN04449;

i.  A 2020 Yellow Acura NSX, VIN 19UNC1B05LY000079;

j.  A 2020 White Porsche 718 Cayman GT4, VIN: WP0AC2A88LK289617;

k.  A 2020 White Nissan 370Z, VIN: JN1AZ4EH0LM823396;

l.  A 2021 Blue Toyota Supra, VIN: WZ1DB0C00MW036881;

m. A 2020 Black Ford Mustang, VIN 1FA6P8K07L5580958; and

n.  A 2020 Silver Ford Shelby GT500 Coupe, VIN 1FA6P8SJXL5502974.

## JURISDICTION AND VENUE

2.  This Court has subject matter jurisdiction over an action commenced by the United States by virtue of 28 U.S.C. § 1345, and over an action for forfeiture by virtue of 28 U.S.C. § 1355.

3.  This Court has *in rem* jurisdiction over the Defendant Assets pursuant to:

a.  28 U.S.C. § 1355(b)(1)(A), because pertinent acts or omissions giving rise to the forfeiture occurred in Naples, Florida, within the Middle District of Florida; and

2

    b. 28 U.S.C. § 1355(b)(1)(B), because venue properly lies in the Middle District of Florida pursuant to 28 U.S.C. § 1395.

4.    Venue is proper in the United States District Court for the Middle District of Florida, pursuant to 28 U.S.C. § 1355(b)(1), because the acts or omissions giving rise to the forfeiture occurred in this district.

### SEIZURE OF THE DEFENDANT ASSETS

5.    The Defendant Asset identified in paragraph 1(a) above, approximately $190,469.56 seized from Glenview Luxury Imports for the anticipated purchase of a 2021 Aston Martin Vantage, VIN SCFSSGAWXMGN05122, was seized by the United States Secret Service (USSS) on January 12, 2021 pursuant to a seizure warrant issued by this Court on December 10, 2020. Case No. 2:20-MJ-1177-NPM. The seizure warrant was executed on Glenview Luxury Imports in Glenview, Illinois, who mailed the Defendant Asset to USSS, Fort Myers Resident Office, via United Parcel Service. The USSS, Asset Forfeiture Branch in Washington, D.C. has possession, custody, and control of the Defendant Asset.

6.    The Defendant Asset identified in paragraph 1(b) above, approximately $79,776.94 seized from First Florida Integrity Bank (FFIB) Account number 1129618 held in the name of Gerald M. Abraham MD, was seized from FFIB, at 3560 Kraft Rd, Naples, Florida, on December 7, 2020. The USSS seized the Defendant Asset pursuant to a seizure warrant issued by this Court on November 30, 2020. Case No. 2:20-mj-1167-NPM. The USSS, Asset Forfeiture Branch in Washington, D.C. has possession, custody, and control of the Defendant Asset.

3

7.      The Defendant Asset identified in paragraph 1(c) above, approximately

$17,279.96 seized from Fifth Third Bank (Fifth Third) Account number 7435380691

held in the name of Gerald Michael Abraham MD PA, and the Defendant Asset

identified in paragraph 1(e) above, approximately $39,965.29 seized from Fifth Third

Account number 7435278051 held in the name of Gerald Michael Abraham MD

PA, were seized from Fifth Third, at 8771 Tamiami Trail N, Naples, Florida, on

December 3, 2020. The USSS seized the Defendant Assets pursuant to seizure

warrants issued by this Court on November 30, 2020. Case Nos. 2:20-mj-1171-NPM,

2:20-mj-1170-NPM. The USSS, Asset Forfeiture Branch in Washington, D.C. has

possession, custody, and control of the Defendant Assets.

8.      The Defendant Asset identified in paragraph 1(d) above, approximately

$112,576.33 seized from American Momentum Bank (AMB) Account number

201500602886 held in the name of Gerald Michael Abraham, was seized from AMB,

at 8625 Tamiami Trail N, Naples, Florida, on December 10, 2020. The USSS seized

the Defendant Asset pursuant to a seizure warrant issued by this Court on November

30, 2020. Case No. 2:20-mj-1169-NPM. The USSS, Asset Forfeiture Branch in

Washington, D.C. has possession, custody, and control of the Defendant Assets.

9.      The Defendant Assets identified in paragraphs 1(f) through 1(m) above,

including  a 2020 Yellow Chevrolet Corvette, VIN 1G1Y82D4XL5109845, 2020

Green Chevrolet Camaro, VIN 1G1FJ1R61L0109519, a 2020 White Aston Martin

Vantage Coupe, VIN SCFSSGCWXLGN04449, a 2020 Yellow Acura NSX, VIN

19UNC1B05LY000079, a 2020 White Porsche 718 Cayman GT4, VIN:

4

WP0AC2A88LK289617, a 2020 White Nissan 370Z, VIN: JN1AZ4EH0LM823396, a 2021 Blue Toyota Supra, VIN: WZ1DB0C00MW036881, and a 2020 Black Ford Mustang, VIN 1FA6P8K07L5580958, were seized by USSS on December 2, 2020 pursuant to seizure warrants issued by this Court on November 30, 2020. Case Nos. 2:20-mj-1160-NPM, 2:20-mj-1161-NPM, 2:20-mj-1162-NPM, 2:20-mj-1163-NPM, 2:20-mj-1168-NPM, 2:20-mj-1172-NPM, 2:20-mj-1173-NPM, 2:20-mj-1159-NPM. The Defendant Asset identified in paragraph 1(n), a 2020 Silver Ford Shelby GT500 Coupe, VIN 1FA6P8SJXL5502974, was seized by USSS on December 2, 2020 based on probable cause that the asset was subject to forfeiture. The Defendant Assets identified in paragraphs 1(f), 1(h), 1(i), 1(j), and 1(n) were seized from storage units rented by Gerald Abraham at Extra Space Storage, 10550 Goodlette Frank Rd, Naples, Florida. The Defendant Asset identified in paragraph 1(g) was seized from Abraham's office, at 11983 Tamiami Trail N, Naples, Florida. The Defendant Asset identified in paragraph 1(k) was seized from Abraham's residence, at 719 Reef Point Circle, Naples, Florida. The Defendant Assets identified in paragraphs 1(l) and 1(m) were seized from the garage of Abraham's neighbor, at 809 Reef Point Circle, Naples, Florida. The Defendant Assets identified in paragraphs 1(f) through 1(n) are currently being housed by a contractor of the USSS, Asset Forfeiture Branch, Professional Towing, at 4516 Causeway Boulevard, Tampa, Florida. Thus, the USSS and its contractor have possession, custody, and control of the Defendant Assets identified in paragraphs 1(f) through 1(n).

10.    Because the Defendant Assets are in the government's possession, custody, or control, pursuant to Supplemental Rule G(3)(b)(i), the Clerk of Court must issue an arrest warrant *in rem*.

## STATUTORY BASIS FOR FORFEITURE

11.    The Defendant Assets are traceable to the proceeds of Dr. Gerald Michael Abraham's distribution of controlled substances in violation of the Controlled Substances Act (CSA), specifically, 21 U.S.C. § 841(a)(1). The Defendant Assets are therefore subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6), which provides for the civil forfeiture of proceeds traceable to an exchange of money furnished by a person for a controlled substance in violation of the CSA.

12.    The Defendant Assets also constitute property involved in money laundering. Specifically, Abraham deposited his drug proceeds into his business checking accounts to conceal or disguise their source and nature in violation of 18 U.S.C. § 1956(a)(1)(B)(i). By depositing the money into his business accounts, Abraham attempted to make it appear to be money lawfully earned in the routine practice of medicine. Abraham also used more than $10,000 of his drug proceeds, or property traceable to his drug proceeds, to purchase luxury vehicles in violation of 18 U.S.C. § 1957(a). The Defendant Assets are thus also subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), which provides for the civil forfeiture of any property involved in a transaction in violation of 18 U.S.C. §§ 1956 or 1957, or any property traceable to such property.

6

13.     As required by Supplemental Rule G(2)(f), the facts set forth herein support a reasonable belief that the government will be able to meet its burden of proof at trial. Specifically, they support a reasonable belief that the government will be able to show, by a preponderance of the evidence, that the Defendant Assets are proceeds of violations of 21 U.S.C. § 841(a)(1), and/or property involved in money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1957(a).

14.     Specific details of the facts and circumstances supporting the forfeiture of the Defendant Assets have been provided by Brian P. Kirby, a Senior Special Agent of the USSS.

## FACTS

15.     Senior Special Agent Kirby has been employed with the USSS for 16 years and is currently assigned to the Fort Myers Resident Office. Senior Special Agent Kirby conducts investigations of the proceeds of illegal activities, specifically money laundering violations of 18 U.S.C. §§ 1956 and 1957, as well as violations of 18 U.S.C. § 1960 and 31 U.S.C. §§ 5316, 5324, and 5330. As a Senior Special Agent with the USSS, Agent Kirby is authorized to investigate all violations of the Federal Code.

16.     During the course of the investigation that gave rise to the seizure of the Defendant Assets, Senior Special Agent Kirby worked closely with Drug Enforcement Administration (DEA) Special Agent Jeb Moser. Special Agent Moser has been employed as a law enforcement officer for approximately 10 years and, since 2017, has been assigned to the DEA Miami Division Office, Tactical Diversion

Squad 1 (TDS-1) charged with investigating crimes related to the diversion of controlled substances. Special Agent Moser has conducted numerous investigations involving the manufacturing and sale of a variety of controlled substances including prescription medications, to include but not limited to, oxycodone, hydromorphone (Dilaudid), alprazolam (Xanax), amphetamine, and hydrocodone. His duties include the investigation of criminal violations under Title 21 of the United States Code. Special Agent Moser conducts criminal and civil investigations regarding violations of the CSA by physicians, pharmacists, and other medical related businesses. As a result, he is experienced in criminal cases in which outside medical experts have deemed physicians' prescribing practices as being outside the scope of accepted medical practice, and he has arrested physicians for such activity in violation of the CSA.

17.    The following facts are based on Senior Special Agent Kirby's personal knowledge of this investigation; knowledge obtained from other law enforcement officers (including Special Agent Moser), his review of the evidence obtained (including reports, recordings of undercover and confidential source visits, and prescription data), and information gained through his training and experience, as well as the training and experience of others.

## I.    PRACTITIONER RESPONSIBILITIES IN PRESCRIBING CONTROLLED SUBSTANCES

18.    The CSA sets forth which drugs and substances are defined as "controlled substances," and those controlled substances are then assigned to one of

five schedules – Schedule I, II, III, IV, or V – depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for using under medical supervision.

19.    Oxycodone is the generic name for a highly addictive prescription painkiller typically used to treat moderate to moderately severe pain, the abuse of which may lead to severe psychological or physical dependence. It is classified as a Schedule II controlled substance sold generally under a variety of brand names including Roxicodone, OxyContin, Percocet, and Endocet.

20.    Hydrocodone is classified as a Schedule II controlled substance and is used to treat moderate to severe pain. It is commonly sold under the name Vicodin.

21.    Alprazolam is classified as a Schedule IV controlled substance that is typically used to treat anxiety disorder, panic disorder, and anxiety caused by depression. It is sold generically under the name Xanax.

22.    Dextroamphetamine and Amphetamine are classified as Schedule II controlled substances that are used to treat ADHD and narcolepsy. They are commonly sold under the name Adderall.

23.    Morphine is classified as a Schedule II controlled substance with a high potential for abuse. It is used for the treatment of pain.

24.    An individual practitioner acting in the usual course of professional practice may issue a legal prescription for a controlled substance for a legitimate medical purpose. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner and the pharmacist who

fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of Section 309 of the CSA (21 U.S.C. § 829).

25. The Electronic-Florida Online Reporting of Controlled Substances Evaluation program (E-Force) is Florida's Prescription Drug Monitoring Program (PDMP). The PDMP was created by the Florida Legislature in 2009 to encourage safer prescribing of controlled substances and to reduce drug abuse and diversion within the State of Florida. E-Force collects, maintains, and stores controlled substances prescription dispensing information in its database and makes the information available to health care practitioners, law enforcement, and regulatory agencies during active investigations.

26. The PDMP provides information on controlled substance prescriptions prescribed by physicians to patients and dispensed by pharmacies in the State of Florida. The data collected by the PDMP is made available to health care practitioners to guide their decision in prescribing and dispensing highly abused prescription drugs. Florida Statutes § 893.055 requires health care practitioners to report to the PDMP each time a controlled substance is dispensed to an individual. This information is to be reported through the electronic system as soon as possible, but not more than seven days after dispensing. This reporting timeframe ensures that health care practitioners have the most up-to-date information available.

27.    When prescribing controlled substances to treat chronic, nonmalignant pain,[1] a physician must abide by Fla. Stat. § 456.44(3(a)-(g), which includes, among other requirements, that the physician:

    a. conduct a complete medical history and a physical examination before beginning any treatment, and document the medical history and examination in the medical record;

    b. develop a written individualized treatment plan for each patient;

    c. discuss the risks and benefits of the use of controlled substances, including the risks of abuse and addiction as well as physical dependence and its consequences, with each patient;

    d. use a written controlled substance agreement outlining the patient's responsibilities;

    e. see the patient at regular intervals, not to exceed three months, to assess the efficacy of the treatment, ensure that controlled substances therapy remains indicated, evaluate the patient's progress towards treatment objectives, consider adverse drug effects, and review the etiology of the pain;

    f. monitor patient compliance;

    g. refer the patient as necessary for additional evaluation and treatment in order to achieve treatment objectives, with special attention to be given to patients who are at risk for misusing their medications and those whose living arrangements pose a risk for medication misuse or diversion;

    h. maintain accurate, current, and complete records that are accessible and readily available for review and compliance with § 456.44, Florida Statutes, the applicable practice act, and applicable board rules;

---

[1] Chronic nonmalignant pain is defined as "pain unrelated to cancer which persists beyond the usual course of disease or the injury that is the cause of the pain or more than 90 days after surgery." Fla. Stat. § 456.44(1)(f).

      i.  refer patients with signs or symptoms of substance abuse to a board-certified pain management physician, an addiction medicine specialist, or a mental health addiction facility as it pertains to drug abuse or addiction; and

      j.  incorporate consultant's recommendations, and document resulting changes in treatment in the patient's medical record.

28.    Florida Administrative Code Rule 64B8-10.002 requires licensed physicians to maintain the full and total responsibility for, and control of, all files and records relating to their patients and their medical practice. The records shall be maintained in the licensed physician's office, or in the possession of the licensed physician, and the records must be maintained for five years from the last patient contact.

## II.    THE INVESTIGATION

29.    In October 2019, the DEA received an anonymous tip that Abraham, a licensed medical doctor who practiced in Naples, Florida, was illegally dispensing controlled substances. Thereafter, Abraham became the subject of an investigation by the DEA and USSS for multiple violations of federal law. The investigation revealed that, since as early as 2018, and continuing through 2020, Abraham issued prescriptions for controlled substances, including oxycodone, hydrocodone, alprazolam (Xanax), and dextroamphetamine and amphetamine (Adderall), outside of the usual course of professional practice and not for a legitimate medical purpose, in violation of the CSA, specifically, 21 U.S.C. § 841(a)(1). Additionally, Abraham laundered the proceeds of that illegal activity through his bank accounts and the purchase of luxury vehicles, in violation of 18 U.S.C. §§ 1956 and 1957.

12

A.   **Abraham Illegally Distributed Controlled Substances in Violation of 21 U.S.C. § 841(a)(1)**

30.     In June 2018, the DEA closed a "pill mill"[2] operating as a pain clinic in the Fort Myers, Florida area.

31.     In October 2019, the DEA learned that Abraham was operating a clinic at 11983 Tamiami Trail North, Ste. 120, Naples, Florida 34110 which had absorbed many of former pill mill customers. Abraham was prescribing large amounts of pain medication for cash outside the scope of his practice, consistent with that of the closed pill mill. Abraham ran his clinic by himself, without any staff or nurses, in a medical office located within a multiple-unit commercial office building. The office was a single room that contained an office desk, a small number of filing cabinets, tables, and various office furniture.

32.     Regular surveillance of Abraham's medical office between 2019 and late 2020 revealed behavior indicative of a pill mill.

33.     On multiple occasions, DEA agents observed vehicles arrive at the office building and then depart after a short time (approximately five to fifteen minutes). High volume, short-in-duration patient visits are consistent with doctors prescribing controlled substances outside of the usual course of professional practice, and not for legitimate medical purposes.

---

[2] A "pill mill" is a medical facility that prescribes controlled substances outside of the usual course of professional practice, and not for legitimate medical purposes.

34.     Agents also observed high traffic in and out of the office building containing the clinic, and groups of individuals standing and conversing outside of the office building, including on Sundays, a day Abraham's office was open but other offices in the building were believed to be closed. Congregating and conversing at a doctor's office is consistent with friends, acquaintances, and associates going to the same doctor because of lax prescribing habits, which is commonly seen in pill mill investigations.

35.     During 2019 and 2020, the DEA used two undercover officers and a confidential source to pose as new patients at Abraham's clinic. The undercover officers and confidential source presented to Abraham with chronic, nonmalignant pain, as part of the ruse. For each initial visit, Abraham charged and collected $450 in cash. For each subsequent visit, Abraham charged and collected $400. In return, Abraham would provide prescriptions for oxycodone, dextroamphetamine and amphetamine (Adderall), alprazolam (Xanax), hydrocodone, and morphine.

36.     The investigation revealed that Abraham's medical office had many hallmarks of a pill mill including, but not limited to, the following:

      a.  issuing prescriptions for no legitimate purpose;

      b.  issuing prescriptions in exchange for cash;

      c.  conducting brief, cursory appointments with patients (i.e., on most occasions, approximately five to fifteen minutes);

      d.  conducting no physical examination or urinalysis exam with patients;

      e.  prescribing opioids to naïve patients from the outset of treatment;

      f. failing to conduct database searches of patients which would provide information as to prior treatment and the possibility of previous diversion or abuse; and

      g. ignoring other signs of dependency, abuse, and/or diversion in patients.

    37.    In addition, during the undercover operations, Abraham failed to inquire why requested prescriptions (including requests for higher dosages) would be medically appropriate, and failed to inquire whether previously prescribed medications were working. Abraham also failed to inquire as to the status of the patient's health or pain. Alternative methods of managing pain were not discussed (other than discussions about it being more difficult to fill prescriptions for the controlled substance without an accompanying prescription for ibuprofen).

    38.    A review of Florida PDMP data on controlled substances dispensed by Abraham from September 1, 2016 through August 31, 2020 demonstrated the Abraham wrote approximately 30,332 controlled substance prescriptions in that time period, with a total pill count amounting to approximately 2,023,657 dosage units. Furthermore, the data demonstrated the following prescribing patterns for Abraham as it relates to oxycodone, alprazolam (Xanax), hydrocodone, morphine, and dextroamphetamine and amphetamine (Adderall):

| Controlled Substance | Period One: September 1, 2016 – August 31, 2018 | Period Two: September 1, 2018 – August 31, 2020 |
|---|---|---|
| Oxycodone | 62 prescriptions; 6,739.5 dosage units | 1,720 prescriptions; 183,439.5 dosage units |

| Alprazolam (Xanax) | 3,879 prescriptions; 277,884 dosage units | 5,304 prescriptions; 374,077 dosage units |
|---|---|---|
| Hydrocodone | 5 prescriptions; 376.5 dosage units | 104 prescriptions; 9,778.9 dosage units |
| Morphine | 23 prescriptions; 1,260 dosage units | 101 prescriptions; 5,330 dosage units |
| Dextroamphetamine and Amphetamine (Adderall) | 25 prescriptions; 848 dosage units | 23 prescriptions; 686 dosage units |

39.     Thus, from Period One to Period Two, Abraham increased his oxycodone prescriptions by approximately 2774%; increased his alprazolam prescriptions by approximately 137%; increased his hydrocodone prescriptions by 2080%;  and increased his morphine prescriptions by approximately 439%.

40.     Mark A. Rubenstein, M.D., FAAPMR, FAAEM was retained by DEA to review documents related to the undercover operations at Abraham's clinic. Dr. Rubenstein is licensed in Florida and is board certified in physical medicine and rehabilitation, pain medicine, and electrodiagnostic medicine. Dr. Rubenstein has been retained as an expert witness in multiple pill mill investigations and has previously testified as an expert witness in pill mill trials in the Middle District of Florida and the Southern District of Florida. Based on his review of DEA reports addressing the undercover visits, the corresponding audio and/or video recording of the visits, and prescriptions obtained from Abraham's medical office, Dr. Rubenstein concluded that Abraham was operating outside the scope of usual medical practice and that the prescriptions provided cannot be deemed issued for a legitimate medical

16

purpose in the usual scope of professional practice with regard to his treatment of the undercover patients.

**B.    The Defendant Assets Seized Are Drug Proceeds and Property Involved in Money Laundering In Violation of 18 U.S.C. §§ 1956 and 1957**

    *1.    Abraham Deposited and Transferred Criminal Proceeds, or Property Traceable to Such Proceeds, In His Bank Accounts in Order to Launder the Proceeds*

41.    As Abraham increased his unlawful distribution of controlled substances, he increased his cash deposits. Without getting a significant portion of his proceeds into the financial system, Abraham could not enjoy his newfound wealth. Thus, Abraham deposited some[3] of the cash into five accounts, at four different banks in Naples, Florida:

| Bank | Account Number |
|---|---|
| Bank United | *****9434 |
| First Florida Integrity Bank | 1129618 |
| Fifth Third Bank | 7435380691 |
| American Momentum Bank | 20150060288 |
| Fifth Third Bank | 7435278051 |

42.    From July 25, 2016 to May 31, 2018, Abraham deposited a total of $400 in cash into his Bank United account, which at that time, was his sole account. However, from June 2018, when Abraham began writing significantly more prescriptions for certain controlled substances, through late 2020, Abraham increased

---

[3] Based upon observations during surveillance and a review of the PDMP data, Abraham did not deposit all of the cash he obtained. Instead, he appeared to deposit a portion, primarily in small amounts each business day.

17

his cash deposits substantially, depositing at least $1,559,476 into the Bank United account as well as his other accounts at First Florida Integrity Bank (FFIB), Fifth Third Bank (Fifth Third), and American Momentum Bank (AMB), which he opened in July and September 2019.

43.    Furthermore, beginning in July 2019, when he had more than one bank account, Abraham routinely moved funds between the above accounts for no apparent business reason.

44.    An analysis of Abraham's five bank accounts demonstrates that his primary source of income was not a legitimate medical practice. Instead, the bulk of the deposits into these bank accounts appear to be proceeds from the illegal dispensing of controlled substances.

45.    As detailed below, Abraham used the accounts, and moved the funds between his accounts, in order to launder his drug proceeds (that is, to get them into the banking system in a way that appeared to be legitimate), in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Specifically, Abraham frequently deposited cash proceeds of his illegal distribution of prescriptions for controlled substances into business checking accounts, primarily in small amounts, to conceal their nature and source, by making them appear to be proceeds generated by lawful medical practice. In addition, Abraham sometimes made deposits and transfers in excess of $10,000, in violation of 18 U.S.C. § 1957(a).

a.    *Bank United Account 9434*

46.    In March 2015, Abraham filed for bankruptcy in the Middle District of Florida. Case No. 9:15-bk-02150-MD. At the time of filing, Abraham represented that his assets were valued at $10,206. In connection with his bankruptcy, Abraham was required to open a debtor-in-possession bank account, which would serve as his only authorized account until the administrative closure of his bankruptcy case. Thus, on or about July 25, 2016, Abraham opened the Bank United account ending in 9434 as his debtor-in-possession account. On June 24, 2017, Abraham's bankruptcy was administratively closed, however Abraham continued to maintain the debtor-in-possession account.

47.    A review of Bank United account 9434 records revealed that, from July 25, 2016 until May 31, 2018, Abraham deposited $299,800.99, only $400 of which was cash. Stated differently, 99.8% of the deposits into the account were from patient or insurance payment checks, social security deposits, and income tax refunds.

48.    In contrast, from June 1, 2018 to September 13, 2019, Abraham deposited a total of $1,015,929.62 into Bank United account 9434, $595,276 of which was cash. An additional $110,066.13 was wire transferred into the account from five luxury vehicle dealers for refunds on vehicle trade-ins. As discussed below, most of those refunds are traceable to prior cash deposits. Only $330,506.59 of the total deposits after May 31, 2018, or 32% of the total deposits, was from patients or insurance checks, social security deposits, and income tax refunds.

19

49.     In October 8, 2018, in response to an inquiry from Bank United as to the reason for the sudden increase in cash deposits and numerous transfers to and from car dealers, Abraham submitted a letter to the bank explaining that, in June 2018, he took over patients from a pain clinic in Fort Myers that had closed. Abraham stated that, due to their unreliability, those patients pay in cash. Abraham also said that the wires were for vehicle trade-ins and various vehicle purchases.

50.     Analysis of all Bank United account 9434 records, along with information contained in PDMP records provided by the DEA, reveal that Abraham's increase in cash deposits are a direct result of the illegal sales of medical prescriptions, which make these cash deposits illegal proceeds of drug violations.

51.     On September 3, 2019, Abraham closed Bank United account 9434 by wiring the remaining balance of $121,672.62 to his newly owned FFIB account 1129618, discussed below. Because more than $10,000 of the $121,672.62 wire was proceeds of the illegal distribution of controlled substances, this wire was sent in violation of 18 U.S.C. § 1957.

*b.     First Florida Integrity Bank Account 1129618*

52.     On July 9, 2019, Abraham opened FFIB checking account number 1129618 in the name Gerald M. Abraham, MD, with a cash deposit of $3,100.

53.     On July 15, 2019, a FFIB teller sent an email to a FFIB branch manager, advising that Abraham was in the bank again making a cash deposit of $7,450, only four days after depositing $30,000 in cash at a FFIB branch located at 1550 Crosspoint Drive in Naples, Florida.

54.    Analysis shows that, from July 9, 2019 to October 6, 2020, Abraham deposited a total of $800,864.90 into FFIB account 1129618, $367,865 of which was cash. As noted above, $121,672.62 was the balance when he closed his Bank United account 9434. Only $311,327.28 of the total deposits, or 39% of the total deposits, was from patients or insurance checks, social security deposits, and income tax refunds.

55.    During numerous surveillances conducted by USSS agents, Abraham was observed driving from his office directly to the FFIB branch located at 1550 Crosspoint Drive to make cash deposits. Abraham was observed carrying a bank style money bag from his office to his vehicle, and then carrying the money bag into the bank. On several occasions, agents also observed Abraham inside the bank making large cash deposits with cash taken from the money bag.

   *c. Fifth Third Bank Account 7435380691*

56.    On July 11, 2019, Abraham opened Fifth Third checking account number 7435380691 in the name Gerald Michael Abraham, MD PA, with a cash deposit of $30,000.[4]

57.    Analysis shows that, from July 11, 2019 to September 14, 2020, Abraham deposited a total of $397,485 into Fifth Third account 7435380691; $167,280 of which was cash. An additional $230,000 was wire transferred into the account from two luxury vehicle dealers for refunds on vehicle trade-ins. Only $205

---

[4] As noted above, on July 11, 2019, Abraham also made a $30,000 cash deposit into FFIB account 1129618.

of the deposits, or .05% of the total deposits, was from patient checks, insurance payments, or social security deposits.

58.    During numerous surveillances conducted by USSS agents, Abraham was observed driving from his office directly to the Fifth Third branch located at 8771 Tamiami Trail N in Naples, Florida to make cash deposits. Abraham was observed carrying a bank style money bag from his office to his vehicle, and then carrying the money bag into the bank. On several occasions, agents observed Abraham inside the bank making large cash deposits with cash taken from the money bag. Agents also observed Abraham making cash deposits from his vehicle at the drive-thru window at this branch.

<em>d.    American Momentum Bank Account 201500602886</em>

59.    On July 11, 2019, Abraham opened AMB checking account number 201500602886 in the name Gerald Michael Abraham, with a deposit of checks totaling $1,833.56.

60.    Analysis shows that, from January 15, 2020 to September 1, 2020, Abraham deposited a total of $485,111.41 into AMB account 201500602886, $432,665 of which was cash. An additional $24,400 was wire transferred into the account from a luxury vehicle dealer for refunds on a vehicle trade-in. Only $52,446.41 of the total deposits, or 11% of the total deposits, was from patient checks, insurance payments, or social security deposits.

61.    During numerous surveillances conducted by USSS agents, Abraham was observed driving from his office directly to the AMB branch located at 8625

Tamiami Trail N. in Naples, Florida to make cash deposits. Abraham was observed carrying a bank style money bag from his office to his vehicle. Abraham was observed making deposits from his vehicle at the drive-through window at this branch.

*e.     Fifth Third Bank Account 7435278051*

62.     On September 8, 2020, Abraham opened Fifth Third checking account number 7435278051 in the name Gerald Michael Abraham, MD PA, with a cash deposit of $13,750. Based upon the facts learned during the investigation, the source of the cash appears to be Abraham's distribution of controlled substances.

63.     Analysis shows that, from September 8, 2020 to September 16, 2020, Abraham deposited a total of $30,600 into Fifth Third account 7435278051, all of which was cash (drug proceeds). There was no other activity in the account during this period.

64.     During multiple surveillances conducted by USSS agents, Abraham was observed driving from his office directly to the Fifth Third branch located at 8771 Tamiami Trail N in Naples, Florida to make cash deposits. Abraham was observed carrying the money bag into the bank. Abraham has also been observed making cash deposits from his vehicle at the drive-thru window at this branch.

65.     In sum, Abraham used his bank accounts at Bank United, FFIB, Fifth Third, and AMB to deposit and launder the proceeds of his CSA violations. As Defendant Assets identified in paragraph 1(b) through 1(e) were seized from

23

Abraham's FFIB, Fifth Third, and AMB bank accounts, these funds are subject to forfeiture.

### 2.     *Abraham Purchased Luxury Vehicles Using the Bank Accounts to Further Launder the Drug Proceeds*

66.     Once the criminal proceeds were deposited into his accounts, Abraham used the funds for a variety of purposes, including to fund the purchase of over 25 high-end, luxury vehicles, between June 2018 and October 2020, as a means of further laundering his drug proceeds.

67.     Abraham routinely purchased and traded high-end, luxury vehicles on a monthly, weekly, and sometimes daily basis. His constant "flipping" of vehicle purchases and trade-ins resulted in substantial losses in equity during this laundering process. It was also a way to legitimize some of his money; specifically, his accounts have received several large transfers from car dealerships when he has sold or traded in a vehicle. While the cars were purchased with drug proceeds, the transfers from the dealerships appear legitimate.

68.     The Defendant Asset identified in paragraph 1(a) represent funds paid by Abraham to purchase a luxury vehicle.

69.     The Defendant Assets identified in paragraph 1(f) through 1(n) and depicted below were luxury vehicles owned by Abraham, which were seized from various locations in in Naples, Florida:

24



70.    As detailed below, these funds and luxury vehicles seized were property traceable to drug proceeds, and were property involved in money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Abraham also used more than $10,000 in drug proceeds, or property traceable to such proceeds, in order to purchase vehicles and further launder the proceeds, in violation of 18 U.S.C. § 1957. As such, these assets are subject to forfeiture.

a.    *$190,469.56 in U.S. Currency for the anticipated purchase of a 2021 Aston Martin Vantage, VIN SCFSSGAWXMGN05122*

71.    On or about November 18, 2020, Abraham entered into a contract to purchase a 2021 Aston Martin Vantage, VIN SCFSSGAWXMGN05122, from Glenview Luxury Imports for $190,469.56.

72.    Abraham made a $5,000.00 deposit on November 18, 2020 using his Pentagon Federal VISA Credit Card ending in 4676. Then, Abraham wired $185,469.56 from Fifth Third account 7435380691 to Glenview Luxury Imports to complete the purchase. As discussed above, Fifth Third account 7435380691 was involved in Abraham's concealment money laundering. Analysis of Fifth Third

25

account 7435380691 revealed multiple cash deposits prior to the $185,469.56 wire to Glenview Luxury Imports. These cash deposits are Abraham's drug proceeds which he laundered by depositing into his bank account.

73.     As Glenview Luxury Imports had not yet received its 2021 inventory, the sale was not completed, and the currency paid by Abraham was seized from Glenview Luxury Imports in the form of a cashier's check in the amount of $190,496.56 received by the USSS, Fort Myers Resident Office. Because the $190,496.56 was proceeds of a controlled substance offense and was intended to be used to purchase the Aston Martin Vantage in violation of 18 U.S.C. § 1957, and the funds and the $185,469.56 wire to Glenview Luxury Imports was made within funds involved in concealment money laundering, the funds are subject to forfeiture.

            b.    *A 2020 Yellow Chevrolet Corvette, VIN 1G1Y82D4XL5109845*

74.     On or about October 12, 2020, Abraham submitted to Florida Department of Motor Vehicles an application to title and register a 2020 Chevrolet Corvette, VIN 1G1Y82D4XL5109845, purchased from Naples Motorsports in Naples, Florida for $129,950. Law enforcement databases do not reflect a lien on the vehicle.

75.     Based upon Abraham's previous activity and a review of the records related to his other vehicle purchases since June 2018, there is reason to believe that Abraham purchased this vehicle using funds that he had laundered through his bank accounts, cash from his illegal activity and/or a trade-in of another vehicle involved in money laundering, any of which make it subject to forfeiture.

26

c. *A 2020 Green Chevrolet Camaro, VIN 1G1FJ1R61L0109519*

76. According to records obtained from Florida Driver and Vehicle Information Database, on May 27, 2020, Abraham applied to title and register a 2020 Chevy Camaro, VIN 1G1FJ1R61L0109519, purchased from New Smyrna Beach Chevrolet, New Smyrna Beach, Florida, for $74,574.35 ($74,805 with taxes and fees).

77. The Chevy Camaro was partly purchased with check #1042 for $40,347.30 drawn from AMB account 201500602886. Analysis of AMB account 201500602886 revealed multiple cash deposits totaling $78,275 in the month prior to the check being written. Moreover, as discussed above, AMB account 201500602886 was involved in concealment money laundering. The purchase of the Camaro with more than $10,000 in drug proceeds also violated 18 U.S.C. § 1957.

78. To partially fund the purchase of the Chevy Camaro, Abraham traded in a 2019 Jaguar SVR F Type Coupe, VIN SAJDZ1FE6KCK58946 for a net trade in value of $34,227.05. The Jaguar was purchased from Porsche of The Main Line for a sales price of $95,000. ($101,173.40 with taxes and fees). Abraham purchased the Jaguar in part with money from Abraham's Fifth Third account 7435380691, FFIB account 1129618, and Bank United account 9434, which were accounts involved in his concealment money laundering.[5]

---

[5] Specifically, according to records obtained from Ally Financial, Abraham made a $50,000 deposit towards the Jaguar, which consisted of a $20,000 wire received from Fifth Third account 7435380691; a $20,000 wire from FFIB account 1129618; and a $10,000 wire from Bank United 9434. The purchase of the Jaguar with more than $10,000 in drug proceeds

> d.  *A 2020 White Aston Martin Vantage Coupe, VIN*
>     *SCFSSGCWXLGN04449*

79.     On or about September 24, 2020, Abraham submitted to the Florida
Department of Motor Vehicles an application to title and register a 2020 Aston
Martin Vantage Coupe, VIN SCFSSGCWXLGN04449, purchased from Aston
Martin Palm Beach in Palm Beach, Florida for $195,081. Law enforcement
databases do not reflect a lien on the vehicle.

80.     Based upon Abraham's previous activity and a review of the records
related to his other vehicle purchases since June 2018, there is reason to believe that
Abraham purchased the Aston Martin Vantage Coupe using funds that he had
laundered through his bank accounts, cash from his illegal activity and/or a trade-in
of another vehicle involved in money laundering, any of which make it subject to
forfeiture.

> e.  *A 2020 Yellow Acura NSX, VIN 19UNC1B05LY000079*

81.     On or about September 26, 2020, Abraham submitted to the Florida
Department of Vehicles an application to title and register a 2020 Acura NSX, VIN
19UNC1B05LY000079, purchased from Naples Acura in Naples, Florida for
$165,695. American Honda Finance Corporation recorded a lien on the 2020 Acura
NSX.

---

also violated 18 U.S.C. § 1957. The remaining $51,173.40 due was financed through Ally
Financial.

82.     Based upon Abraham's previous activity and a review of the records related to his other vehicle purchases since June 2018, there is reason to believe that Abraham purchased this vehicle using funds that he had laundered through his bank accounts, cash from his illegal activity and/or a trade-in of another vehicle involved in money laundering, any of which make it subject to forfeiture.

f.     *A 2020 Porsche 718 Cayman GT4, VIN:*
*WP0AC2A88LK289617*

83.     On or about August 24, 2020, Abraham submitted to the Florida Department of Motor Vehicles an application to title and register a 2020 Porsche Cayman, VIN WP0AC2A88LK289617, purchased from Gulf Coast Auto Group LLC for $113,860 ($114,550 after taxes and fees).

84.     Abraham purchased the Porsche Cayman by trading in a 2019 Porsche GT3, VIN WP0AC2A97KS149453, for a net trade-in credit of $131,060.89, and received a credit refund of $16,510.89. The Porsche GT3 was purchased on May 31, 2019 from Rusnak Westlake in Thousand Oaks, California, for $201,685 ($215,802.95 after taxes and fees). Abraham paid the bulk of the purchase price with a $180,000 wire from Bank United account 9434, which as discussed above, was primarily funded by multiple cash deposits (drug proceeds). Because Abraham used funds that he had laundered into Bank United account 9434 to purchase the 2019 Porsche GT and then traded it in for the 2020 Porsche Cayman, the Porsche Cayman is property involved in money laundering and was purchased in violation of 18 U.S.C. § 1957.

29

g.  *A 2020 White Nissan 370Z, VIN: JN1AZ4EH0LM823396*

85.  On or about May 7, 2020, Abraham applied to the Florida Department of Motor Vehicles to title and register a 2020 Nissan 370Z MT NISMO, VIN JN1AZ4EH0LM823396, purchased from Naples Nissan in Naples, Florida for $54,306.97. Like the other vehicle purchases, this purchase was made in violation of 18 U.S.C. § 1957 and involved drug proceeds that had been involved in concealment money laundering.

86.  The 2020 Nissan 370Z was purchased with check #993 drawn on Fifth Third account 7435380691 in the amount of $25,000. The check appears to have been funded with multiple cash deposits and a $15,000 refund check deposited from Long-Lewis of the River Region car dealership. The remainder of the sales price, $29,306.97, was financed through MidFlorida Credit Union.

87.  On or about August 14, 2020, Abraham satisfied the lien on the Nissan with AMB account 201500602886 check #1048 for $29,635.55 payable to Mid Florida Credit Union. Analysis of AMB account 201500602886 revealed multiple cash deposits prior to check #1048 being written. As discussed above, these cash deposits are Abraham's drug proceeds, which were involved in his concealment money laundering. As a result, the Nissan is traceable to funds involved in money laundering, and the satisfaction of the lien violates 18 U.S.C. § 1957.

h.  *A 2021 Blue Toyota Supra, VIN: WZ1DB0C00MW036881*

88.  On or about September 24, 2020, Abraham submitted to the Florida Department of Motor Vehicles an application to title and register a 2021 Toyota

Supra, VIN WZ1DB0C00MW036881, purchased from Southern 441 Toyota in Royal Palm Beach, Florida for $59,195 ($62,765.82 with taxes and fees).

89.    Abraham purchased the Toyota Supra in part via check #1056 drawn from AMB account 201500602886, in the amount of $39,265.82. Analysis of AMB account 201500602886 revealed multiple cash deposits prior to this purchase. As discussed above, these cash deposits are Abraham's drug proceeds which he laundered by depositing into his bank account. As a result, the $39,265.82 check and purchase of the Toyota Supra are traceable to laundered funds and violate 18 U.S.C. § 1957.

90.    Part of the Toyota Supra was also purchased by trading in a 2020 Hyundai Veloster, VIN KMHT36AH2LU006273, for a trade-in value of $23,500. The Hyundai Veloster was also purchased with funds in AMB account 201500602886, which, as discussed above, were laundered drug proceeds.[6]

        *i.*    *A 2020 Black Ford Mustang, VIN 1FA6P8K07L5580958*

91.    On or about June 2, 2020, Abraham applied to title and register a 2020 Ford Mustang, VIN 1FA6P8K07L5580958, purchased from Gary Yeomans Ford in Daytona Beach for $54,585.

---

[6] Specifically, Abraham had previously purchased the Hyundai from Tamiami Hyundai for $27,470 ($30,719.44 with taxes and fees) via check #1043 for $8,542.47 on July 31, 2020 and check #1051 for $22,176.97 on August 16, 2020, both of which were drawn from AMB account 201500602886. Analysis of AMB account 201500602886 revealed multiple cash deposits prior to each check, and, as discussed above, these cash deposits are Abraham's drug proceeds which he laundered by depositing into his bank account. As a result, Abraham purchased the Hyundai with laundered funds and the purchase violates 18 U.S.C. § 1957.

92.     To purchase this vehicle, Abraham traded in a 2019 Ford Mustang,

VIN 1FA6P8JZ1K5552216, which had been purchased with laundered funds,

making the vehicle traceable to laundered funds. Specifically, Abraham purchased

the 2019 Mustang from Brown Lee Ford LLC on or about September 21, 2019 for

$94,355 ($110,286.88 with taxes and fees). The purchase was partially funded by a

$25,000 wire on October 7, 2019 from FFIB account 1129618. As discussed above,

the FFIB account 1129618 was funded with multiple cash deposits, totaling $124,270

made in the months prior to the wire transfer. Because these funds were Abraham's

drug proceeds which had been involved in his concealment money laundering, the

2019 Ford Mustang (and the 2020 Ford Mustang that it was traded-in to purchase)

are subject to forfeiture. The purchase of each vehicle was made in violation of 18

U.S.C. § 1957. The 2019 Ford Mustang was also purchased by trading in another

2019 Ford Mustang, VIN 1FA6P8CF1K5112449 for a net trade-in value of -

$13,020.29, because of an outstanding lien.[7] The remainder of the purchase price for

the 2019 Ford Mustang, $85,286.88, was financed through Ford Motor Credit

Company LLC.

---

[7] The 2019 Ford Mustang, VIN 1FA6P8CF1K5112449 was purchased on August 6, 2019
for $76,978 ($85,742.13 with taxes and fees). Abraham partially purchased the vehicle via a
$15,000 wire from Bank United account 9434 on August 9, 2019. In the month before this
wire, Abraham had deposited $77,550 in cash (drug proceeds) into Bank United 9334 as
part of his concealment money laundering. Abraham also a traded in of a different 2019
Ford Mustang, VIN1FA6P8K04K5505245, valued at $43,000 but with a negative net trade-
in value owing $5,766. This vehicle was also purchased with drug proceeds, but was not a
credit to the purchase price. The remaining $70,742.13 was financed with Ford Motor
Credit Co.

>    *j.*    *A 2020 Silver Ford Shelby GT500 Coupe, VIN*
>            *1FA6P8SJXL5502974*

93.    On or about October 30, 2020, Abraham purchased a 2020 Ford Shelby

GT500 Coupe, VIN 1FA6P8SJXL5502974 from Dean Sellers Inc. for $124,591.54.

94.    The Ford Shelby GT500 Coupe was purchased in part via a $59,591.54

wire payment from Fifth Third Account 7435380691. Analysis of the Fifth Third

Account 7435380691 revealed multiple cash deposits prior to the $59,581.54

payment to Dean Sellers Inc. These cash deposits are Abraham's drug proceeds,

which he laundered by depositing into his bank account. As a result, the purchase of

the vehicle violated 18 U.S.C. § 1957.

95.    Abraham also traded in a 2019 Porsche 718 Cayman S Coupe VIN

WP0AB2A88KS278845 for a credit of $65,000 towards the purchase of the Ford

Shelby GT500. The Porsche 718 Cayman S Coupe was previously purchased on

October 27, 2020 for $82,599.67, from Porsche Naples, via a $56,099.67 wire

payment from his Fifth Third account 7435380691, and by trading in a 2020 Mazda

CNV, VIN JM1NDAM75L0411390, which had also originally been purchased with

funds from Fifth Third account 7435380691.[8] Analysis of Fifth Third Account

---

[8] Abraham previously purchased the Mazda CNV on June 27, 2020 from Naples Mazda for
$33,979.00 by tendering check # 995 from Fifth Third Account 7435380691, in the amount
of $4,500, and financing the remainder of the purchase price through Toyota Motor Credit.
There is probable cause to believe that Abraham used funds for the purchase of the Mazda
CNV that he had laundered into his bank accounts, cash from his illegal activity, and/or
cash involved in money laundering, any of which makes the Mazda CNV subject to
forfeiture. On September 11, 2020, Abraham satisfied the lien with a $33,979.00 payment
from AMB account 201500602886. Analysis of AMB account 201500602886 reveals
multiple cash deposits prior to the lien satisfaction with Toyota Motor Credit Corp. These
cash deposits are Abraham's drug proceeds which he laundered by depositing into his bank

7435380691 revealed multiple cash deposits prior to the $56,099.67 payment to Porsche Naples. These cash deposits are Abraham's drug proceeds which he laundered by depositing into his bank account. As a result, purchase of the Porsche 718 Cayman S Coupe violated 18 U.S.C. § 1957.

## III.   CONCLUSION

96.    As required by Supplemental Rule G(2)(f), the facts set forth above support a reasonable belief that the Government will be able to meet its burden at trial. Specifically, they support a reasonable belief that the Government will be able to show, by a preponderance of the evidence, that the Defendant Assets are (1) traceable to the proceeds of Abraham's distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1), and (2) are property involved in money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1957(a), or are property traceable to such property.

Respectfully Submitted,

KARIN HOPPMANN
Acting United States Attorney

By:   *s/James A. Muench*
JAMES A. MUENCH
Assistant United States Attorney
Florida Bar Number 472867
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
(813) 274-6000 – telephone
E-mail: james.muench2@usdoj.gov

---

account. As a result, purchase of the Mazda CNV violated 18 U.S.C. § 1957.

34

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Brian P. Kirby, declare under penalty of perjury that:

I am a Senior Special Agent with the United States Secret Service. I have read the foregoing Verified Complaint for Forfeiture *in Rem* and have personal knowledge that the matters alleged as fact in the Complaint are true.

I have acquired my knowledge in this matter through my personal experience, observation, investigation, and training, and from witnesses, records, and other law enforcement officers.

Executed this __3__ day of June, 2021.

*Brian P Kirby*
_____
Brian P. Kirby
Senior Special Agent
United States Secret Service